FILED
1st JUDICIAL DISTRICT COURT
Santa Fe County
12/31/2018 6:38 PM
STEPHEN T. PACHECO
CLERK OF THE COURT
Jennifer Romero

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

GOUTAM GUPTA,

          Petitioner,

v.                                                    Case No. D-101-DM-2013-00531

JENNIFER CHRISTINE
VAN VELKINBURGH,

          Respondent.

## RESPONDENT'S TRIAL BRIEF

Respondent Jennifer van Velkinburgh, by and through her undersigned counsel, hereby submits her Trial Brief.

In their Marital Settlement Agreement (MSA), Husband Dr. Goutam Gupta, and Wife Dr. Jennifer van Velkinburgh, agreed that Wife would receive "50% of any and all due financial interest, income, licensing fees, and the like" for any of Husband's patents filed through May 2018. (MSA, July 23, 2013, attached as Exhibit A, at 2–3.) Although the marriage ended in 2013, Wife continued collaborating with Husband on his inventions for two more years. Wife is a biophysicist as is Husband, and had to resign as a new scientist at LANL to marry Dr. Gupta.

In January 2017, well before the May 2018 cutoff, Dr. Gupta filed his most valuable patent application, U.S. No. 15/412,420 (the '420 Application) and transferred it to his new company, Innate Immunity LLC, in exchange for 25% percent of Innate's stock. (Ex. B, Schedule of Members.) A patent application describes an invention, and the '420 Application describes an invention to genetically prevent two devastating plant diseases that currently cost the citrus and grape-growing industries billions of dollars of losses. Innate is commercializing and marketing this invention, which it describes as "a patented technology to generate transgenic" grapevines and citrus trees that are immune to the two diseases. (Ex. C.)

1

**EXHIBIT A**

Dr. Gupta was given his 25% equity in exchange for "Intellectual Property." (Ex. B.) Dr. Gupta has argued that his 25% equity was in exchange not only for the '420 Application but also other intellectual property—but has failed to provide any documents relating to this other intellectual property. The only intellectual property Dr. Gupta transferred to Innate around the time he received his stock was the '420 Application. (Ex. D, '420 Assignment.) Innate has confirmed that the only patent of Dr. Gupta's transferred to Innate is the '420 Application.

Husband has tried a series of strategies to evade Dr. van Velkinburgh's 50% financial interest in his patents—from a motion to undo the MSA because he did not know English well enough, to his recent motion to remove the '420 Application from the MSA. Husband later conceded it is subject to he MSA, as it was obviously filed before May 2018, and asked for a trial on the theory that because he has not yet received cash for the patent application, there is nothing to share. Wife has asked either for 50% of the equity Husband received for the patent—so that she will share in anything or nothing that equity produces—or for its present cash value. Husband has refused and made clear that even when Innate does make money, he will claim Wife still should not get anything for her 50% interest because there would have to be another allocation of what revenue is attributable to the '420 invention.

These supposed problems can be solved by the Court. If Husband had traded the patent application for an airplane, his argument would mean he should have that airplane for the rest of his life, and Wife should get nothing because he did not get cash for the patent. In that scenario we would ask the Court to value the airplane and award Dr. van Velkinburgh half the value. If Dr. Gupta had traded his patent for a house, we would ask the same thing.

Here Dr. Gupta traded his patent not for an airplane or a house, but for stock in a company. Stock can be difficult to value, but fortunately Innate and Dr. Gupta valued the stock at the time of its issuance. When Dr. Gupta traded the '420 Application for 25% of Innate's

2

**EXHIBIT A**

stock, Innate sold stock to other investors for cash. (Ex. B, Schedule of Members.) In that transaction eight investors paid $12,500 for each 1% of its stock they purchased. Some investors paid $100,000 for 8% of Innate's equity, others paid $50,000 for 4%, or $25,000 for 2%, as reflected in the snapshot below.

**EXHIBIT A**
**SCHEDULE OF MEMBERS**

| Founder Members | Percentage Interest | Initial Capital Account | Nature of Contribution |
|---|---|---|---|
| **Dr. Goutam Gupta**<br>c/o HD3<br>1475 Bishops Lodge Road<br>Santa Fe, NM  87506<br>▮▮▮ | 25.00% | | Intellectual Property |
| **High Desert Discovery District Equity Holdings, LLC**<br>1475 Bishops Lodge Road<br>Santa Fe, NM  87506<br>michelleh@hddd.org<br>▮▮▮ | 25.00% | | Advisory Services/Manager |

| Investor Members | | | |
|---|---|---|---|
| ▮▮▮ | 4.0% | $50,000.00 | Capital Contribution |
| ▮▮▮ | 4.0% | $50,000.00 | Capital Contribution |
| ▮▮▮ | 2.0% | $25,000.00 | Capital Contribution |

The full table is attached as Exhibit B. To buy 25% would take $312,500, so this is the value Dr. Gupta received for his intellectual property. Innate, its investors, Dr. Gupta, and Michelle Miller,

3

**EXHIBIT A**

its CEO, collectively agreed the company was worth $1.25 million at this time—the total of the cash, intellectual property, and management put into the company at its founding.

Dr. van Velkinburgh's 50% financial interest under the MSA is thus worth $156,250—half of the value of the stock Dr. Gupta received for his patent application. Alternatively, the Court could order that half of Dr. Gupta's 25% (or 12.5% of Innate's equity), be transferred to Dr. van Velkinburgh so that she receives whatever financial remuneration 12.5% of Innate generates, if anything.

The second problem Dr. Gupta raises is just as easily solved. If and when Innate begins distributing profits to its stockholders, Dr. Gupta's lawyers argue there will be no way to tell how much of that money is attributable to the '420 application. Under their theory, Dr. Gupta could become a billionaire through ownership in the company that commercialized his invention, but Wife's 50% financial interest is still worth nothing. But the allocation of revenue to the patent application was done when the patent application was assigned to Innate *in exchange for equity—a set share of Innate's future distributions*. Dr. Gupta and Innate decided that the '420 Application was worth 25% of Innate's value. Dr. Gupta did not leave to chance what share of Innate's earnings should be allocated to the technology he provided to the company; he and Innate agreed that allocation should be 25%. (Another 25% went to the company's manager, Michelle Miller, through her company High Desert Discovery District. Everything else needed to bring the technology to market was allocated the remaining 50%.) But the '420 intellectual property was allocated 25%, and half of that belongs to Wife.

While the Court has been evaluating these issues, Dr. Gupta and Innate had the idea that they could eliminate Wife's claims if Innate gave the '420 Application back to Dr. Gupta. They did this on December 11, 2018, one day before the last hearing set by the Court. (Ex. E, Re-Assignment to Gupta.) But Dr. Gupta did not give back the consideration he got for selling the

4

**EXHIBIT A**

patent to Innate in the first place. Dr. Gupta kept the 25% equity he received for selling the invention to Innate—equity in which Wife has a 50% financial interest.

The re-assignment was a sham—and the latest in a series of such efforts to eliminate Wife's interest in Husband's patents now that they are being commercialized. Husband has argued that with the patent now back in Husband's hands, if Innate wants to license it, Innate can pay to do so and Wife will share half the proceeds. But Innate already paid for the patent once with 25% of its stock. And Dr. Gupta was already compensated for the patent, so he has no incentive to force Innate to pay again. Any additional price Innate might agree to with Husband would not be an arms-length bargain but an insider-to-insider nominal price. Most likely there would be no license at all. Husband can retain the patent and allow Innate to use it for free.

## ISSUES PRESENTED

1. Whether Dr. van Velkinburgh should receive 50% of the financial value of the equity Dr. Gupta received for the '420 Application, $156,250, or should receive 50% of the equity itself.

2. Whether Innate's free re-assignment of the '420 Application to Dr. Gupta does away with Dr. van Velkinburgh's 50% financial interest in the stock Dr. Gupta still has from his original sale of the patent to Innate—or is a diversion that should be ignored.

3. Whether Dr. van Velkinburgh is entitled to an award of attorneys' fees under the MSA for pursuing enforcement of Dr. Gupta's MSA obligations, particularly given his pattern of evading of her stipulated interest, his refusal to obey the Court's March 6, 2018 Stipulated Order to disclose information related to her interest, and the recent sham re-assignment seeking to undermine the Court's ability to grant relief?

The three other issues recently asserted by Dr. van Velkinburgh require extensive discovery and expert testimony, and there is no possibility of preparing them for the January 18, 2019 trial. Dr. van Velkinburgh respectfully requests that the Court retain jurisdiction on these issues for a subsequent trial at a later date if that becomes necessary.

4. Whether Dr. van Velkinburgh owns an interest in the October 2018 patent Dr. Gupta filed, entitled Compositions and Methods for the Treatment of Huanglongbing (HLB)

5

**EXHIBIT A**

a/k/a Citrus Greening in Citrus Plants (hereinafter the "CGCP Application") if it claims priority to and is dependent on the '420 Application.

5. Whether Dr. Gupta has deprived Dr. van Velkinburgh of her right to receive a distribution of royalties from MSA patents owned by LANS, by virtue of his use of LANS-owned patents without paying for a license from LANS.

6. Whether Dr. van Velkinburgh is a co-inventor of the '420 Application.

## SUMMARY OF ARGUMENT

**Issue 1**: Whether Dr. van Velkinburgh should receive 50% of the financial value of the equity Dr. Gupta received for the '420 Application, $156,250, or should receive 50% of the equity itself.

1. What Dr. Gupta received for his sale of the '420 Application to Innate was 25% of the stock in the company. (Ex. B.) This equity was valued at $312,500 by Innate at its founding.

2. Dr. van Velkinburgh owns a 50% financial interest in what Dr. Gupta received for the '420 Application, or 12.5% of the stock in Innate Immunity. (MSA, Ex. A, at 2–3.) Alternatively the Court could completely separate the parties by cashing Wife out of that equity at the founding valuation of $156,250 plus interest. (*Id.*)

3. Husband has fiduciary responsibilities to manage his inventions for the benefit of both himself and Dr. van Velkinburgh. *Kenfield v. United States*, 783 F.2d 966, 969 (10th Cir. 1986) (where divorce judgment gave financial interest in partnership to wife but left management rights in husband, "[w]e do not believe [husband] had uncontrolled discretion to leave profits in the partnership and thereby deprive his ex-wife indefinitely of the money to which she was entitled. . . . This discretion surely would be subject to the requirement that it be exercised reasonably under a trustee-like responsibility to the coowner ex-wife.").

6

**EXHIBIT A**

**Issue 2:** Whether Innate's recent re-assignment of the '420 Application to Dr. Gupta for free does away with Dr. van Velkinburgh's 50% financial interest in the stock Dr. Gupta got in his original sale of the technology to Innate—or whether the re-assignment is a diversion that should be ignored.

4. Innate's re-assignment of the '420 Application for no consideration should be ignored because Dr. Gupta already sold it for value at the company's founding and retained that value after the re-assignment.

5. The purported December 11, 2018 assignment has the earmarks of a sham because there was no consideration for the transfer. Nothing prevents Dr. Gupta from immediately reassigning the '420 Application following the trial of this matter (and as required by Dr. Gupta's Proprietary Information and Intellectual Property Assignment Agreement with Innate); Dr. Gupta and Innate retain an intimate employee-employer relationship with one another and have coordinated their legal strategy in this litigation. *See Royal Indem. Co v. McClendon*, 1958-NMSC-019, ¶ 6, 64 N.M. 46 (providing list of indicia of a sham transaction, including "lack of consideration for the conveyance, retention by the grantor of possession of the property, the relationship between the parties, the retention of benefits to the transferor, and the threat or pendency of litigation.")

6. Whether the re-assignment is a sham or not, Dr. Gupta received full consideration from the '420 Application when he sold it to Innate two years ago in the form of a 25% equity interest in Innate, and under the MSA Dr. van Velkinburgh is entitled to 50% of that interest.

**Issue 3**: Whether Dr. van Velkinburgh is entitled to an award of attorneys' fees as provided under the MSA for pursuing enforcement of Dr. Gupta's obligations under the MSA, particularly given his evading of her interest, his refusal to obey this Court's March 6, 2018 Stipulated Order to disclose information related to her interest, and the recent re-assignment seeking to undermine the possibility of granting relief.

7. Dr. van Velkinburgh has retained three successive law firms to deal with Dr. Gupta's evasion of her 50% interest in Husband's patents provided in the MSA.

8. First she sought Dr. Gupta's compliance herself, by asking him for financial information on the company commercializing his patent. Dr. Gupta referred Dr. van Velkinburgh to Michelle Miller.

9. When Dr. van Velkinburgh's counsel sent a letter to Ms. Miller requesting the information, she received no response from Ms. Miller. Dr. Gupta hired an attorney and rescinded his permission for Dr. van Velkinburgh to seek information from Ms. Miller. (Letter from Jamison Barkley to Karen Aubrey, August 28, 2017.)

10. Counsel for Dr. Gupta has taken varied positions throughout the litigation, representing that she was in the process of gathering relevant documents bearing on Dr. van Velkinburgh's 50% interest, and then claiming no documents exist, then conceding they exist but refusing to provide them.

11. Dr. van Velkinburgh was forced to file a motion to enforce the MSA, and entered into mediation. (Stipulated Order Resolving All Pending Motions, filed on March 6, 2018.)

12. When Husband refused to provide the information ordered in the Stipulated Order, Dr. van Velkinburgh retained Leonard Katz, and eventually this firm.

13. Husband took the untenable position in writing to this Court that Wife had no MSA interest in the '420 Application even though it was filed well within the period set forth in the MSA for patents in which Wife was given an interest. (Petitioner Goutam Gupta's Motion for Determination of Rights, September 24, 2018.) Only after Wife's counsel responded at considerable expense did Husband concede this position was meritless and agree to another stipulated order.

14. Husband then engaged in a sham transfer of the '420 Application without consideration. Dr. van Velkinburgh has incurred significant legal expenses and spent a year and a half attempting to enforce what the MSA gave her against these tactics.

**EXHIBIT A**

15. The MSA provides that "[i]n the event either party defaults in any obligation under this agreement, the defaulting party *shall be liable* to the other party for all reasonable expenses incurred by the other, including attorneys fees and costs, in pursuing enforcement of the obligations created by this agreement." (MSA, Ex. A hereto, § VII(6).)

16. Dr. van Velkinburgh requests a ruling awarding her reasonable attorneys' fees in enforcing the MSA.

### DR. VAN VELKINBURGH DOES NOT HAVE SUFFICIENT INFORMATION FROM INNATE AND DR. GUPTA TO HAVE A FAIR TRIAL ON THE REMAINING ISSUES PRESENTED

17. Three remaining issues set out above may need the Court's assistance, but they will require discovery, development, and expert testimony and cannot be presented for decision at the January 18, 2019 trial. Dr. Gupta has filed a new patent application in October 2018 that may legally "relate back" to the '420 Application by claiming things already disclosed in the '420—and if so should be subject to the MSA.

18. Although Dr. van Velkinburgh requested the application documents, Dr. Gupta's counsel have provided only some. Among the documents not provided is the Application Data Sheet, which would typically express whether the patent relates back to an MSA patent by being a continuation, divisional, or continuation in part of an MSA patent so that Dr. van Velkinburgh would own an interest in it as well. 35 U.S.C. §§ 119–20; 37 CFR 1.78.

19. Whether Dr. van Velkinburgh is a co-inventor requires Dr. Gupta's lab notebooks or other documentation showing when and how the invention in the '420 Application was developed—which Dr. Gupta has refused to provide. In addition, expert testimony would be extremely helpful to the fact-finder on the questions involved in inventorship and in whether Innate is infringing LANL patents with Dr. Gupta's consent in order to avoid paying licensing royalties to LANL which Wife would share in. *See* 35 U.S.C. § 116 (providing that a person is a

9

**EXHIBIT A**

co-inventor of an invention if she did not make the same type or amount of contribution and even if she did not make a contribution to the subject matter of every claim of the patent). An investment of time and expense will be necessary to secure an expert to evaluate the claims in the '420 Application and comparison of those claims with Dr. van Velkinburgh's contributions to demonstrate co-inventorship.

## CONCLUSION

WHEREFORE Respondent Jennifer van Velkinburgh respectfully requests that the Court (1) award Dr. van Velkinburgh one-half Dr. Gupta's 25% interest in Innate or the $156,500 cash value of the '420 Application plus interest; (2) grant Dr. van Velkinburgh's reasonable attorneys' fees in enforcing the MSA; and (3) grant such other relief as the Court deems just and proper.

Dated: December 31, 2018.

Respectfully submitted,

BARDACKE ALLISON LLP

By */s/ Benjamin Allison*
Benjamin Allison
Breanna Contreras
Victor G. Grafe III
141 E. Palace Avenue
Santa Fe, NM 87501
T: 505-995-8000
F: 505-672-7037
ben@bardackeallison.com
breanna@bardackeallison.com
victor@bardackeallison.com

*Counsel for Jennifer van Velkinburgh*

# EXHIBIT A

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 31st day of December, 2018, I filed the foregoing *Respondent's Trial Brief* electronically through the E-File and Serve System which caused the following to be served via electronic notice as more specifically set forth in the Notification of Service:

LAW OFFICE OF JAMISON BARKLEY, LLC

Jamison Barkley
316 Garfield St.
Santa Fe, NM 87501
(505) 995-9602
jamison@jamisonbarkley.com

WALTHER BENNETT MAYO HONEYCUTT P.C.

Sarah Bennett
123 E. Marcy Street, Suite 205
Santa Fe, NM  87501
(505) 795-7117
sarahb@wbmhlaw.com

*Counsel for Goutam Gupta*

                                                BARDACKE ALLISON LLP

                                                 */s/ Benjamin Allison*
                                                Benjamin Allison

## **EXHIBIT A**

FILED
FIRST JUDICIAL
DISTRICT COURT

2013 JUL 25 PM 3: 24

IN THE FIRST JUDICIAL DISTRICT COURT
COUNTY OF SANTA FE
STATE OF NEW MEXICO

NO. D 101-DM 2013- 00531

**GOUTAM GUPTA,**

    Petitioner,

vs.

**JENNIFER CHRISTINE VAN VELKINBURGH,**

    Respondent.

### MARITAL SETTLEMENT AGREEMENT

COME NOW the parties hereto and, subject to approval of the Court, stipulate and agree as follows:

### ARTICLE I: RECITALS

1.    <u>The Parties</u>. This Marital Settlement Agreement is made by and between Goutam Gupta (hereinafter referred to as "Husband") and Jennifer Christine van Velkinburgh (hereinafter referred to as "Wife").

2.    <u>Compromise Agreement</u>. The parties have reached this compromise Agreement satisfactory to each of them as to their rights and obligations and a division of their property regardless of the actual separate property or community property nature thereof. They have reduced their Agreement to writing to be approved by the Court. The parties agree that the terms of this Agreement shall be incorporated by reference in a Final Decree approving this Agreement and that the terms of this Agreement shall become an Order of the Court. The parties acknowledge that no formal discovery has been had, and that they are relying, in good faith,

Page -1-

**EXHIBIT A**
EXHIBIT A

entirely on the representations of each other as to financial matters.

3. <u>The Marriage</u>. The parties were married on or about April 21, 2007 in Santa Fe, New Mexico, and have remained Husband and Wife ever since.

4. <u>Minor Children</u>. No children have been born to this marriage.

## ARTICLE II: SPOUSAL SUPPORT

Husband shall pay to wife as and for spousal support from the date of the entry of the Final Decree to and including May 1, 2018 the sum of $1,485.00 per month. Payments shall be made on the first (1st) day of each month. Such spousal support shall be taxable income to Wife and tax deductible to Husband. In the event Husband's income increases by 19% or more at any time during which he has the obligation to pay spousal support, said spousal support shall increase by the same percentage, but shall be otherwise non-modifiable.

## ARTICLE III: PROPERTY AND DEBTS

A. <u>Division of Property.</u>

1. <u>Property awarded to Wife</u>: Wife shall receive as her sole and separate property, free and clear of any and all claims by or interest of Husband:

(a) The residence located at 707 E. Palace Avenue, Santa Fe, NM 87501 (purchased by wife before the marriage).

(b) Automobile: 1998 BMW VIN # ending in 2558.

(b) All furniture, furnishings, personal property, art, rugs, pots, musical instruments, and all other personal property in her possession pursuant to the agreement of the parties.

(c) 50% of any and all due financial interest, income, licensing fees, and the like for the following patents filed by/awarded to/ worked on during the marriage by husband:

Page -2-


**EXHIBIT A**

      i. No. 8395123 filed September 22, 2010, awarded March 12, 2013;

      ii. No,. 7576183 filed December 24, 2013, awarded August 18, 2009;

      iii. No. 7432419 filed May 14, 2004; awarded October 7, 2008

      iv. Any patent filed by Husband before May 1, 2018.

(d) 50% of the community interest in Husbands LANS/LANL pension;

(e) 50% of the community interest in any LANS/LANL capital accumulation plan payout;

(f) 50% of the community interest in the 2033 hours of Husband's accumulated sick leave, at the future hourly rate on the date of cash-out (435.64 hours). If Husband uses these 435.64 hours of sick leave after the date of divorce, but before his retirement, Husband will pay a lump sum to Wife upon retirement which equals 435.64 hours times the then current hourly wage.

(g). Health Insurance: Husband will pay wife's health insurance, including medical, dental and vision, until 5/1/2018. Wife's health insurance will have the same coverage/deductible/co-pay as the insurance provided during the marriage. Husband will pay any additional amounts required for health care related costs that are in excess of the amounts currently listed on the BCBS insurance care ($20.00 co-pay; $15 prescription). Any costs not covered, such as MRI, mammogram, or ultrasound will be paid by Husband.

(h) Life Insurance and beneficiary designation: For so long as Husband is obligated to pay spousal support, or until 5/1/2019 if husband remarries, husband shall continue Wife as beneficiary on all life insurance, disability and retirement plans.

(i) Other Insurance: Husband will pay 100% of wife's homeowner's insurance ("studs-in

Page -3-

# EXHIBIT A

EXHIBIT A

bequeath by will his or her interest in any property awarded to him or her herein. Unless otherwise specified herein, each party waives any right to the estate of the other and any right to be the personal representative of the estate of the other under the law either the laws of succession or under any testamentary instrument.

      6.     <u>Default.</u>  In the event either party defaults in any obligation under this agreement, the defaulting party shall be liable to the other party for all reasonable expenses incurred by the other, including attorneys fees and costs, in pursuing enforcement of the obligations created by this agreement.

      7.     <u>Future Acquisitions.</u> Any property acquired, and any income earned, by either party after July 1, 2013 shall be the sole and separate property of the party acquiring or earning the same.

      8.     <u>Severability.</u>  If any term of this agreement is determined to be invalid or unenforceable by a court of competent jurisdiction, the other terms of this agreement shall survive and be enforceable independently. The failure of either party to insist upon strict performance of any of the provisions of this agreement shall not be construed as a waiver of enforcement of any subsequent default of the same or similar nature.

      9.     <u>Final Agreement.</u>  This agreement is the complete and final agreement between the parties, and no prior or contemporaneous communication, discussion or negotiation may be used to vary or contradict its terms.  All prior contemporaneous statements or communications are merged into this agreement.

      10.    <u>No Presumption in the Event of Ambiguity:</u> In the event of an ambiguity in this agreement, there shall be no presumption for or against either party due to the fact that counsel


EXHIBIT A

# EXHIBITS B – E
# ARE CONFIDENTIAL
# AND ARE PROVIDED TO
# THE COURT UNDER SEAL

**EXHIBIT A**